* * * * * * * * * * *
The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Decision and Order of the Deputy Commissioner.
 * * * * * * * * * * *
After filing the Decision and Order in this case, Deputy Commissioner Glenn issued an Amended Decision and Order filed June 30, 2005. Plaintiff alleges that defendant failed to properly appeal from Deputy Commissioner Glenn's Amended Decision and Order. The Amended Decision and Order and defendant's notice of appeal from the first Decision and Order were both dated June 30, 2005. The Commission is unable to discern from its records the actual times on June 30, 2005, when defendant received the Amended Decision and Order and when defendant faxed its notice of appeal. At the arguments before the Full Commission, defense counsel informed the Commission that at the time the appeal was filed, she had not received the Amended Decision and Order. Thus, the Commission reasonably infers that defendant appealed from the first Decision and Order. The Amended Decision and Order had no effect, since once defendant appealed, the Deputy Commissioner was divested of jurisdiction to issue the Amended Decision and Order. Therefore, the appeal lies from the first Decision and Order filed June 24, 2005.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All the parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Tort Claims Act.
2. The employees of the State named in plaintiff's affidavit are Shuaib Ahmad, Larry Monteith, Jemma Rayfield Jack, Downey Brill, and Phillip Stiles.
3. The issues to be determined by the Commission are whether plaintiff was injured by the negligence of the named employees of defendant, whether defendant ratified the conduct of Dr. Ahmad, and if so, what, if any, damages plaintiff is entitled to receive under the Tort Claims Act.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. These consolidated tort claims involve the sexual harassment of plaintiffs Kathy Wood and Evalyn Gonzales by Dr. Shuaib Ahmad. Dr. Ahmad was an employee of North Carolina State University who first joined the Department of Civil Engineering as an Assistant Professor in 1980. He was promoted to Associate Professor in 1986 and Professor in 1991. In the 1996-1997 academic year, Dr. Ahmad became the Director of the Construction Facilities Laboratory on Centennial Campus. Dr. Ahmad was a principal or co-principal investigator in a wide array of research projects in the area of civil infrastructure with emphasis in materials and structural engineering.
2. Prior to the sexual harassment of plaintiff by Dr. Ahmad in 1996, during the 1987-1988 school year, Dr. Ahmad also sexually harassed Martha Brinson, who was employed by North Carolina State University as the Director of Communications in the College of Engineering. During that school year, work was being done on the building where Ms. Brinson's office was normally housed. Therefore, her office was moved to Mann Hall, the building on campus where the School of Civil Engineering was located and in which Dr. Ahmad also had an office.
3. After her office was moved to Mann Hall, Ms. Brinson met Dr. Ahmad who befriended her. He later told her that he read palms and asked her if he could read her palms. After discussing this matter with her husband, Ms. Brinson decided that she would allow Dr. Ahmad to read her palms. Dr. Ahmad also told Ms. Brinson that he could relieve stress. She agreed to meet with Dr. Ahmad after her normal working hours ended for the sole purpose of allowing him to read her palms.
4. Dr. Ahmad suggested to Ms. Brinson that they have the palm reading in his separate office in D.H. Hill Library. At his request, Ms. Brinson accompanied Dr. Ahmad to the library. He took her into a room, closed the door and began to read her palms. He told Ms. Brinson that she had a short lifespan. Dr. Ahmad then approached Ms. Brinson from behind, touched her shoulders and then grabbed one of her breasts. She jumped up from her chair and told Dr. Ahmad that his conduct was inappropriate. She then ran out of the office. Dr. Ahmad ran behind her and tried to set up future meetings with her. He told Ms. Brinson not to tell anyone about the incident.
5. Ms. Brinson went back towards Mann Hall. She saw her husband and got into the car with him. Dr. Ahmad saw her getting into the car and veered off in another direction. When Ms. Brinson got into the car, she was so distraught that she could not speak to her husband for 30 minutes. When she told her husband about what Dr. Ahmad had done to her, her husband advised her that when she returned to work the next morning, she should tell her supervisor what had happened.
6. When Ms. Brinson returned to work the next morning, she told her immediate supervisor, Jenna Rayfield (Jack), that on the previous day Dr. Ahmad sexually harassed her by feeling her breast. Ms. Rayfield instructed Ms. Brinson to tell the Dean of the College of Engineering, Dr. Larry Monteith, about the incident.
7. Ms. Brinson met with Dr. Monteith that same day and advised him that Dr. Ahmad sexually harassed her the day before by touching her breast. Within 12 months after Ms. Brinson complained of Dr. Ahmad's sexual harassment, Dr. Monteith became Chancellor of North Carolina State University.
8. Dr. Monteith suggested that Ms. Brinson file a formal sexual harassment complaint with Billy Richardson, the University's sexual harassment officer. However, Ms. Brinson decided not to file a formal complaint because of the way she had been treated by Ms. Richardson when she reported a prior incident involving a "peeping Tom" to Ms. Richardson. A man named William Farabee frightened Ms. Brinson as she was working in the evening when he stared through a window into Ms. Brinson's office. The window was partially open and a hanger kept him from getting through the window. Mr. Farabee yelled profanity at Ms. Brinson and tried to get into her office, which made her afraid and anxious.
9. When Ms. Brinson reported the incident to Ms. Richardson, Ms. Richardson informed Ms. Brinson that this was not the first incident with Mr. Farabee at the University. Ms. Richardson told Ms. Brinson that there had been other incidents at the University in which female students reported Mr. Farabee peeping into their dormitory room windows. Ms. Richardson told Ms. Brinson that "it was only Willie," that he was just a "peeping Tom," and that "he wouldn't hurt anybody." Based upon this experience, Ms. Brinson believed that Ms. Richardson would not take her complaint about Dr. Ahmad seriously and that the incident would be minimized. For those reasons, Ms. Brinson decided not to file a formal complaint against Dr. Ahmad.
10. Dr. Downey Brill became Dean of the College of Civil Engineering in 1988 or 1989. Shortly thereafter, Ms. Brinson told Dr. Brill that she had been sexually harassed by Dr. Ahmad touching her breast. She told Dr. Brill that Dr. Ahmad was a sexual predator and that "he is a monster." Dr. Brill told her that he was shocked and asked her if she had reported the sexual harassment. She told him that she had reported the incident, but did not file a formal complaint. Ms. Brinson wanted her complaint kept confidential.
11. Defendant's agents Ms. Rayfield, Dr. Monteith, and Dr. Brill did nothing after they were made aware that Dr. Ahmad sexually harassed Ms. Brinson. Dr. Monteith and Dr. Brill did not document in writing Ms. Brinson's complaint, did not follow up to make sure that Ms. Brinson's complaint was investigated and resolved, and did not discuss Ms. Brinson's allegations with Dr. Ahmad or counsel him about his conduct with female employees and students. After this incident occurred, Dr. Ahmad was promoted twice by North Carolina State University upon the recommendations of Dr. Brill and other University staff members.
12. Plaintiff Kathy Wood attended North Carolina State University from 1993 to 1998. She majored in civil engineering and environmental engineering, which is a five-year academic program. Plaintiff had an academic and athletic scholarship and was also an active member of Chi Omega Sorority, where she was involved in many community activities. Plaintiff was hired to work as a research assistant to Dr. Ahmad in May of 1996, because she was interested in pursuing the field of structural engineering, the area of Dr. Ahmad's expertise.
13. Shortly after she became his research associate, Dr. Ahmad began to touch plaintiff in sexually inappropriate ways. He rubbed her arms. When she went to get a book in his office, he pinned her up against the wall so the front of his body, including his genitals, was pressed against the rear of her body. Dr. Ahmad repeatedly and frequently rubbed her leg and put his hand underneath her shorts up toward her panty line and she would freeze. He also "smelled" her and hugged her before she left work. He pinned her body against a computer screen.
14. Dr. Ahmad told plaintiff that he had a beach project that he wanted her to work on with him. He told her he wanted her to go to the beach with him on the weekend. He offered her an "aphrodisiac nut." Plaintiff left her job in August of 1996, although Dr. Ahmad asked her to continue working with him during the fall term.
15. After this experience, plaintiff did everything that she could to avoid seeing Dr. Ahmad. She refused to take his class in structural engineering, which meant that she could not go any farther in that curriculum at North Carolina State University. Plaintiff began having crying spells after experiencing Dr. Ahmad's sexual harassment, and cried in other classes. Plaintiff also began experiencing nightmares and depression as a result of Dr. Ahmad's sexual harassment.
16. Plaintiff went to Leslie Dare, North Carolina State's sexual harassment officer at that time, and reported to Ms. Dare the sexual harassment that she experienced from Dr. Ahmad. Plaintiff learned that Dr. Ahmad had sexually harassed other female students and employees. She also found out that Dr. Ahmad had sexually harassed Evalyn Gonzales (plaintiff in TA-16035 which was consolidated for hearing with the case herein).
17. Ms. Gonzales graduated from North Carolina State University with a B.S. in Engineering. Ms. Gonzales wanted to attend graduate school, so she applied for a job as a research assistant at North Carolina State University. She was contacted by Dr. Ahmad, whom she had never met before. During her job interview, Dr. Ahmad told Ms. Gonzales that he would like to show her Centennial Campus since sometimes she would work in a lab. Dr. Ahmad drove Ms. Gonzales to Centennial Campus to show her the laboratory. He told her that he liked her because her skin color was the same as his. Sometime later, Ms. Gonzales called Dr. Ahmad back to check on the job vacancy and Dr. Ahmad said he had time to talk with her "over coffee." He asked if he could pick her up at her apartment, but she told him that she would meet him on campus. Ms. Gonzales met Dr. Ahmad at the Bell Tower, where she got into his car. Dr. Ahmad told her that they could talk over lunch.
18. After lunch, Ms. Gonzales and Dr. Ahmad left the restaurant and got back in Dr. Ahmad's car. Dr. Ahmad turned his car away from the University and Centennial Campus which confused Ms. Gonzales. Dr. Ahmad drove to Lake Johnson where he parked his car and told her to take a walk with him in order to digest their food. Ms. Gonzales continued to feel uncomfortable, but she tried to trust Dr. Ahmad because of his position at the University. Near the water, Dr. Ahmad put his hands on her neck and attempted to rub her neck, head, hair and scalp. He then put his hands around her neck. Dr. Ahmad took his hands off Ms. Gonzales' neck and began to unbutton her top and move his hand onto her breast. Ms. Gonzales started yelling, "this isn't okay!" Dr. Ahmad grabbed both of her arms and said, "it's okay." He then asked her to give him a hug. Again, Ms. Gonzales told him, "this is not okay!" He said to her, "maybe you need to be laying down." Dr. Ahmad suddenly changed the conversation and started talking about his sunglasses. Ms. Gonzales was in shock, and they got back into Dr. Ahmad's car. He began driving back to campus and, at the first entrance to the campus, Ms. Gonzales got out of the car. As she exited the car, Dr. Ahmad told her that he would have the secretary draw up the papers to hire Ms. Gonzales as his research assistant. Ms. Gonzales got away from Dr. Ahmad as fast as she could and went to her boyfriend's office, where she told him how Dr. Ahmad sexually harassed her.
19. Ms. Gonzales then talked to Tony Modesta, who had previously worked for Dr. Ahmad, and he told her that she should talk to plaintiff herein, Kathy Wood. Ms. Gonzales called plaintiff, who advised her to write down what had happened. Ms. Gonzales and plaintiff shared their experiences of being sexually harassed by Dr. Ahmad. Plaintiff also told Ms. Gonzales about another woman that Dr. Ahmad had allegedly sexually harassed.
20. Ms. Gonzales then contacted a former professor who suggested that she talk with Leslie Dare. Ms. Dare advised Ms. Gonzales to file a formal complaint.
21. Dr. Tony Mitchell, who was assisting Ms. Dare in the investigation of the complaints by plaintiff and Ms. Gonzales, learned from Dr. Brill that Ms. Brinson had been involved in a sexual harassment incident ten years earlier. Dr. Mitchell talked to Ms. Brinson about the new complaints and the need for her to write down her own incident with Dr. Ahmad. Ms. Brinson gave a written complaint to Ms. Dare to assist the investigation into Dr. Ahmad's conduct.
22. As part of their investigation, Dr. Mitchell and Ms. Dare conducted interviews and found at least eight women, in addition to plaintiffs Gonzales and Wood and Ms. Brinson, who were sexually harassed by Dr. Ahmad during the period from 1986 to June 1997. Based on the investigation, on December 19, 1997, Phillip J. Stiles, Provost and Vice Chancellor for Academic Affairs, informed Dr. Ahmad of his intent to discharge Dr. Ahmad and that he had 10 days of receipt of the letter to make a written request for either a specification of reasons or a hearing.
23. When plaintiff talked to Dr. Mazanari, Dean of the College of Engineering, he told her that the University had to allow Dr. Ahmad to respond to her complaint. He further told her that Dr. Ahmad could request a hearing within 10 days, but, if he did not, he would be automatically terminated by the University.
24. Dr. Mazanari later told plaintiff and Ms. Gonzales that Dr. Ahmad did not respond to the University within the time period required by University policy to request a hearing. Shortly thereafter, Dr. Mazanari or Ms. Dare told plaintiff and Ms. Gonzales that the University did not fire Dr. Ahmad, but allowed him to resign. Plaintiff and Ms. Gonzales were also told that the University agreed to pay Dr. Ahmad his salary for the remainder of the school year. The University also informed plaintiff and Ms. Gonzales that, as part of the agreement dealing with his resignation, the University was to place a "neutral" letter of reference in Dr. Ahmad's personnel file.
25. After the University informed plaintiff and Ms. Gonzales of the above-mentioned agreement, Ms. Dare had no further communications with plaintiff and Ms. Gonzales. Thereafter, plaintiff and Ms. Gonzales attempted to talk with then-Chancellor Marianne Fox at North Carolina State University, but she refused to talk with them.
26. At the hearing before the Deputy Commissioner, Debra Ragan Jessup testified as an expert witness. Ms. Jessup has taught at the Calloway School of Business at Wake Forest University since August of 1997. She received a B.S. degree from Georgetown University in 1982, and a J.D. from Wake Forest University School of Law in 1988. She has been the recipient of the Graduate Teaching Award at Wake Forest University.
27. Ms. Jessup has also been a consultant for major corporations in North Carolina in the field of human resources. She was tendered by plaintiff and Ms. Gonzales as an expert witness and accepted by the Commission as an expert in the field of human resources. In preparation for her testimony, Ms. Jessup reviewed various documents in this action, including the depositions of plaintiff and Ms. Gonzales, the North Carolina State University Sexual Harassment Guidelines in 1987 and Sexual Harassment Policy Draft in 1997, North Carolina State University's investigative report regarding Dr. Ahmad, and the 1987 Sexual Harassment Policy at UNC-Chapel Hill.
28. Based upon the expert testimony of Ms. Jessup, the Commission finds as facts that defendant had a duty to investigate any allegation of sexual harassment and that defendant breached the applicable standard of care with regard to Ms. Brinson in 1988 by failing to investigate her complaint. The University's Sexual Harassment Guidelines in effect as of 1986 required that an individual was to be requested to reduce a complaint to writing, that the administrator receiving the complaint should properly document the reported harassment, and that the employee should be informed of each oral or written complaint of sexual harassment made against him or her. In violation of the Guidelines, no supervisor asked Ms. Brinson to put her complaint regarding Dr. Ahmad in writing. Dr. Monteith, Dr. Brill and Ms. Rayfield violated defendant's Sexual Harassment Guidelines by failing to write up Ms. Brinson's allegations and by failing to put the allegations in Dr. Ahmad's personnel file.
29. Ms. Jessup further testified that as of August 1, 1987, the University of North Carolina at Chapel Hill, a constituent member of the University of North Carolina System, had a sexual harassment policy that required supervisors or administrators to act immediately once they had knowledge of sexual harassment. This policy was consistent with the standard practice in 1987. However, defendant's Guidelines were defective because they did not require management, once it received a sexual harassment complaint, to initiate investigation of the complaint and follow up to see if the complaint was resolved. The Commission finds that it was a breach of the standard of care for defendant's supervisors not to investigate Ms. Brinson's allegations of sexual harassment once they had knowledge of these alleged acts. Dr. Monteith sent Ms. Brinson to talk to Ms. Richardson and made no efforts to follow up to insure that her complaint was investigated and resolved.
30. The Commission further finds that it was a breach of the standard of care for defendant to promote Dr. Ahmad after the University was placed on notice that he had sexually harassed Ms. Brinson; that at the time of Ms. Brinson's sexual harassment complaint to the University, Title VII of the Civil Rights Act of 1964 required employers to take sexual harassment complaints seriously; and that as of the time of Ms. Brinson's complaint of sexual harassment to the University, the common law of North Carolina was that the knowledge by an agent and/or manager was imputed to the employer, as was enunciated by the North Carolina Court of Appeals in Hogan v. Forsyth Country Club Co.
[79 N.C. App. 483, 340 S.E. 2d 116 (1986), disc. rev. denied,317 N.C. App. 334, 346 S.E. 2d 140 (1986)].
31. Ms. Jessup also stated and the Commission finds that the University had a duty to disseminate the sexual harassment policy to employees and students regarding the proper procedures to follow and that defendant breached that duty by not providing a copy of the Guidelines to students and employees. Ms. Jessup stated her opinion that defendant handled the sexual harassment complaints of plaintiff and Ms. Gonzales in a manner consistent with the standard of practice in 1997-98 and conducted a thorough investigation. However, in light of the nature and number of allegations, it was a breach of the standard of care for the University not to suspend Dr. Ahmad pending the investigation and to allow him to continue to teach his classes, conduct research and supervise students during the time and that defendant should at least have removed him from any contact with female students. Dr. Ahmad should have been terminated when he did not respond to plaintiffs' formal complaints within the 10-day time period allowed by defendant's own rules. In addition, the University's reference letter for Dr. Ahmad was positive and not neutral.
32. Dr. Rosemary Nelson, who testified as an expert witness for plaintiff, has been a licensed clinical psychologist in North Carolina since 1988. She received her Ph.D. in Clinical Psychology from the University of North Carolina at Greensboro in 1979. Dr. Nelson was tendered by plaintiff and Ms. Gonzales as an expert witness in the field of psychology.
33. In preparation for her testimony, Dr. Nelson reviewed the following documents: the medical records for both plaintiff and Ms. Gonzales; the mediation brochures; and the depositions of plaintiff and Ms. Gonzales. She also interviewed both plaintiff and Ms. Gonzales over the telephone and performed a brief screening checklist for post-traumatic stress disorder (PTSD). Dr. Nelson also reviewed the medical records of Dr. Valerie McLain, a licensed psychologist who treated plaintiff, and the records from Julia Piper, L.M.S.W., who counseled Ms. Gonzales.
34. Based upon Dr. Nelson's expert opinions and consistent with Dr. McLain's records, the Commission finds as facts that plaintiff suffered severe mental distress as a result of the sexual harassment from Dr. Ahmad; that plaintiff was diagnosed with PTSD, major depressive disorder, and anxiety disorder using the DSM-IV; that Dr. Ahmad's sexual harassment caused plaintiff's severe mental distress, her depressive disorder, and anxiety disorder; that plaintiff's prognosis is guarded; and that plaintiff's psychological disorder is permanent.
31. Prior to testifying, Dr. Gary Albrecht, who received his Ph.D. in economics from Indiana University in 1986, reviewed the depositions of plaintiff and Ms. Gonzales; the federal tax returns for plaintiff from 1998-2003; data from the U.S. Department of Labor, Occupational Handbook of Electrical Engineering; data from North Carolina State University regarding starting salaries for Ph.D. graduates in electrical engineering; and the Occupational Outlook Handbook.
32. Dr. Albrecht testified that plaintiff is currently earning $67,000.00-$68,000.00 a year. Dr. Albrecht's economic calculations regarding plaintiff were admitted into evidence. The present value of plaintiff's future loss of earnings, according to Dr. Albrecht, is $697,490.00. Dr. Albrecht took into account that plaintiff intended to get a Ph.D. in engineering. He assumed that she would have obtained her Ph.D. by 2005 at age 30. Plaintiff gave up her plans to seek a Ph.D. in engineering after she was sexually harassed by Dr. Ahmad.
33. Plaintiff was born April 11, 1975, and is currently 30 years of age. Her life expectancy under the North Carolina Mortality Tables is 47.5 years.
34. Once defendant performed an investigation regarding the allegations that Dr. Ahmad sexually harassed female students or employees, approximately eight additional women alleged that Dr. Ahmad sexually harassed them. Seven of the eight additional complaints, plus the complaints of plaintiffs Wood and Gonzales, involved events that occurred after Ms. Brinson informed her supervisor and Dr. Monteith of the incident between Ms. Brinson and Dr. Ahmad.
35. During the 1987-1988 school year, Dr. Ahmad intentionally inflicted severe emotional distress upon Ms. Brinson by sexually harassing her at the University. Ms. Brinson's report of the incident with Dr. Ahmad placed defendant on notice of the sexual harassment by Dr. Ahmad. Defendant failed to properly investigate the allegations to determine whether the incident was true, and, if so, what steps should have been taken to prevent the sexual harassment from happening again. Defendant failed to properly counsel Dr. Ahmad that such conduct was unacceptable and would not be tolerated, in order to prevent further instances of sexual harassment against female students or employees of defendant.
36. In 1996, Dr. Ahmad intentionally inflicted severe emotional distress upon plaintiff Kathy Wood by sexually harassing her when she applied to be his research assistant. Defendant's failure to act after it was put on notice of Dr. Ahmad's prior sexual harassment of Ms. Brinson constitutes negligence and defendant's negligence was the proximate cause of plaintiff's severe emotional distress sustained as the result of Dr. Ahmad's sexual harassment. Defendant was also negligent in its failure to conduct a full investigation of and appropriately discipline Dr. Ahmad after defendant knew of Dr. Ahmad's sexual harassment of Ms. Brinson. Defendant was negligent in failing to follow its written Sexual Harassment Guidelines of 1986.
37. Defendant was also negligent in supervising Dr. Ahmad. In fact, defendant did nothing to counsel or discipline Dr. Ahmad after Ms. Brinson complained of being sexually harassed. Defendant had a pattern of ignoring sexual misconduct and threatening behavior. Twice, defendant promoted Dr. Ahmad after it knew of his alleged sexual harassment of Ms. Brinson. In fact, Dr. Brill recommended that Dr. Ahmad be promoted to a full professor and later, head of research at Centennial Campus, all after Ms. Brinson told Dr. Brill that Dr. Ahmad sexually harassed her and that he was a "monster" and a "sexual predator." Defendant's negligence in continuing to retain Dr. Ahmad and failing to adequately supervise Dr. Ahmad allowed Dr. Ahmad to continue sexually harassing female students, including plaintiffs Wood and Gonzales, Julie Ann Hunkins, Leigh Lane, Nancy Campanella, Michelle Phillips, Zeynep Savas, Kim Sackett, and Karen Boshoff.
38. Defendant's pattern of ignoring complaints of sexual misconduct and threatening behavior is further shown by its inaction toward the "peeping Tom" actions of Mr. Farabee. In 1986 Ms. Richardson, defendant's sexual harassment officer, failed to take Ms. Brinson's complaint seriously and did not investigate, despite Ms. Richardson's admission that Mr. Farabee was a "peeping Tom." The parties stipulated that Mr. Farabee was not barred from the campus of North Carolina State University until 2002. Taking 16 years to bar a "peeping Tom" from the University shows institutional indifference and a lack of concern on the part of defendant.
39. Defendant ratified Dr. Ahmad's sexual harassment of plaintiff, as shown by defendant's failure to terminate Dr. Ahmad's employment after he did not respond within the 10-day time limit required by defendant's policy, defendant's positive letter of recommendation of Dr. Ahmad, and defendant's payment of Dr. Ahmad's full salary and benefits for half a year after finding that Dr. Ahmad had sexually harassed plaintiff, Ms. Gonzales, and other female students.
40. Dr. Ahmad's intentional infliction of emotional distress from his sexual harassment of plaintiff was ratified by defendant. Defendant's negligence in retaining Dr. Ahmad in its employ, declining to intervene to prevent further offensive behavior, and failing to properly supervise Dr. Ahmad signify an intention to acquiesce in, approve and ratify Dr. Ahmad's misconduct and constitutes the negligent infliction of severe emotional distress, which caused plaintiff's depression, severe emotional distress and past and future loss of earnings.
41. The reasonable value of the emotional pain and suffering and loss of earnings which plaintiff incurred as a proximate result of the injury caused by defendant's named employee is $150,000.00.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. "Under the Tort Claims Act, negligence is determined by the same rules as those applicable to private parties." Bolkhir v.N.C. State Univ., 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988). To establish negligence a plaintiff must show that defendant failed to exercise due care in the performance of a legal duty owed to plaintiff and that the negligent breach of that duty was the proximate cause of plaintiff's injury. Id.
2. Liability of an employer for the torts of his agents can be established in three situations: (1) an agent's actions are expressly authorized by the employer; (2) an agent's actions are committed within the scope of his employment and in furtherance of the employer's business; or (3) an agent's actions are ratified by the employer. Snow v. DeButts, 212 N.C. 120,193 S.E. 224 (1937); Hogan v. Forsyth Country Club Co.,79 N.C. App. 483, 340 S.E.2d 116 (1986), disc. rev. denied,317 N.C. 334, 346 S.E.2d 140 (1986).
3. In the case at bar, once defendant was placed on notice of Dr. Ahmad's sexual misconduct, it had a duty to intervene to prevent him from sexually harassing other female employees and/or female students. Defendant, through its agents, was negligent in its failure to act when it became aware of the alleged sexual misconduct of Dr. Ahmad toward Ms. Brinson and in its failure to properly counsel and supervise Dr. Ahmad and by retaining and promoting Dr. Ahmad after the incident was reported. As the result of defendant's negligence, plaintiff sustained emotional and financial damages. N.C. Gen. Stat. § 143-291 et seq.
4. Defendant ratified Dr. Ahmad's intentional infliction of emotional distress of plaintiff by its failure to terminate Dr. Ahmad when he did not respond within the 10-day limit mandated by University policy, by paying Dr. Ahmad's full salary for half a year and by issuing a positive letter of recommendation for Dr. Ahmad's use after finding that Dr. Ahmad sexually harassed plaintiff. Hogan v. Forsyth Country Club Co., supra.
5. Defendant's conduct amounts to a failure to exercise such care as would be exercised by a reasonable and prudent employer under similar circumstances and thus constitutes negligence.Id.
6. The negligence of defendant's named employees proximately caused plaintiff's emotional pain and suffering and loss of earnings for which she is entitled to receive $150,000.00.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay plaintiff the amount of $150,000.00.
2. Defendant shall pay plaintiff's costs.
This 10th day of April 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER